UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIDGETTE R. GRIFFITH,

               Plaintiff,                      Civil Action No. 12-15079

       v.                            District Judge Terrence G. Berg
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [13] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

     In 2010, Plaintiff Bridgette Griffith applied for supplemental security income alleging that she was disabled from full-time work due to various mental and physical impairments, including Asperger's Syndrome, anemia, and a herniated disc in her lower back. An administrative law judge, acting on behalf of Defendant Commissioner of Social Security ("Commissioner") denied her application, concluding that there were jobs that Griffith could perform. Griffith filed this suit to challenge that decision. Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 13, 15). For the reasons set forth below, this Court finds that Griffith has not shown that the ALJ reversibly erred in evaluating the limitations attributable to Asperger's Syndrome or Griffith's other impairments. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 15) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

In January 2010, Griffith, then 19 years old, protectively filed an application for supplemental security income alleging that she became disabled beginning January 1, 1998, when she was eight years old. (Tr. 10, 130.) Griffith later amended her disability onset date to January 28, 2010, the date she filed her application. (Tr. 10.) Griffith's application was denied at the initial review level in July 2010. (Tr. 10.) She then requested a hearing before an administrative law judge, and, on May 19, 2011, Griffith appeared with counsel and via video conference before Administrative Law Judge William M. Manico ("the ALJ"). (*See* Tr. 26-67.) In an August 12, 2011 decision, the ALJ concluded that Griffith was not under a "disability" as that term is used in the Social Security Act. (*See* Tr. 10-20.) His decision became the final decision of the Commissioner on October 3, 2012, when the Social Security Administration's Appeals Council denied Griffith's request for further administrative review. (Tr. 1.) This suit followed.

### B. Plaintiff's and Plaintiff's Mother's Testimony

At her administrative hearing before the ALJ, Griffith and her mother testified to Griffith's medical history and why they believed that Griffith could not work.

Regarding her physical problems, Griffith testified to back and knee pain. (Tr. 30-32.) When asked what was wrong with her right knee, Griffith responded, "Something, like, arthritis, or something. I don't remember, exactly, the diagnosis. I'm sorry, I'm autistic, and sometimes these things —." (Tr. 31.) Griffith took Tylenol for her pain because "with my stomach and my GERD [gastroesophageal reflux disease], I cannot take NSAIDs [non-steroidal anti-inflammatories] like ibuprofen. But sometimes I've had to go into the ER and get Valium and Vicodin for my back if it's

2

acting up extremely bad." (Tr. 23.) In terms of physical functioning, Griffith provided, "I can't stand for a—for very long, I can't sit down for very long, I can't lift anything heavier than 10 pounds. But the biggest problem I have is my psychological problems, with my Asperger's, autism." (Tr. 32.)

Regarding her mental impairments, Griffith explained, "I'm just—I'm very scared of a lot of people and large groups. I'm slightly agoraphobic. And with my anxiety of being around and interacting with people, it gets so bad that it causes me to physically be ill, where I'm vomiting for, like, an hour, and I'm just dry-heaving. And it's not good." (Tr. 33.) Griffith also explained how she had to drop out of school during the 2009-10 school year because of stress-induced vomiting:

> I hadn't physically been in [high] school since October [2009][1] because I was throwing up a lot at school. And the school finally said that I was not to come back until I had figured out what was wrong with me. And we went through a battery of tests. I had an upper and lower GI, I had a colonoscopy, tons of blood work done, and they couldn't find anything wrong with me. And, finally, my gastro doctor and my therapist suggested that it might be stress-related because I was constantly trying to keep up with school, and I kept falling behind because of my illness, and that maybe I should drop out and take my GED. And I finally decided to do that. It was a really hard decision to make, but I'm glad I did.

(Tr. 34.)

Griffith testified that her medications helped with her mental impairments. She was taking Prozac and, at night, Trazodone. (Tr. 38-39.) When asked if Prozac had side effects, Griffith responded, "No, it's been very helpful." (Tr. 39.) She explained, "normally I'd be a lot more anxious than I am now, and I would probably be having a panic attack right now. And it just—it helps calm me down a bit, and helps with my depression, and it helps me function better, but—that's really all."

---

[1]Treatment notes from two different sources indicate that Griffith was having issues with vomiting in the fall of 2009. (Tr. 409, 490 (noting a "homebound teaching program" due to vomiting).)

(Tr. 39.) But Griffith also stated, "I had a few panic attacks on the way here." (Tr. 60.)

Griffith described her typical day. She said she woke up at 2:30 p.m. because she was afraid of sleeping at night and thus would not go to sleep until 5:30 a.m. (Tr. 59.) Her day then involved accompanying her mother on errands because she did not like to be alone. (*Id.*; *see also* Tr. 40.) She continued, "If we don't have any errands to run I'll probably just read, or I'll talk to mom to see what's going on with her, I'll talk to my friends online, and I'll watch, maybe, a movie or TV. But I tend to keep to myself. It's easier." (Tr. 59.)

Griffith's mother, Belinda Rumptz, also testified at the hearing. She testified that Griffith had seen a "mental health care professional" since age two. (Tr. 49.) She also explained that in 1988, when Griffith was seven years old, she had two hospitalizations for psychological problems. (Tr. 47-49.) She provided that Griffith was diagnosed with Asperger's around age 17. (Tr. 51; *see also* Tr. 57.) In response to a question about the type of psychological problems affecting Griffith's ability to work, Rumptz testified:

> One is when she's under a lot of stress she tends—she throws up. That's a given. Work stress, she would start to throw up with that.
>
> Two, I think with her concentration and her focus she wouldn't be able to complete tasks. And that's evidenced by chores. Whenever I give her chores to do at home I have to continually work with her to tell her, "Okay, we need to have the dishwasher unloaded. That means let's do the bottom first or do the top first. Get that task done then move on." I'm constantly, like, right next to her, you know, motivating her, trying to tell her the next thing we have to go to, the next thing because she doesn't have very good reasoning skills or organizational skills.
>
> The other thing, I think, is her issues with people and leaving the house. She has a very hard time being around people. She's had this most of her life. She gets very scared. And that, too, will bring around stress and fear; so then she'll throw up.

4

(Tr. 50-51 (paragraphing altered).) In discussing Griffith's Asperger's, Rumptz provided that Griffith had "very poor social skills": "Things that she asks people are inappropriate, the mannerisms in which she behaves, sometimes the way she dresses." (Tr. 58.) Griffith immediately added, "I blurt things out." (*Id.*)

### C. Medical Evidence

#### 1. Treatment for Physical Impairments

In February 2009, Griffith fell in her school's parking lot, injuring her knee and back. (Tr. 305, 417.) She saw Dr. Maria Goleba, her primary care physician. (*Id.*) Dr. Goleba ordered an MRI, which showed a small amount of joint effusion (fluid) and minimal osteoarthritis. (Tr. 417, 452.)

In March 2009, Griffith reported dizzy spells. (Tr. 415.) Dr. Goleba assessed dysmenorrhea and severe anemia and referred Griffith to Dr. Veena Kalra. (*Id.*)  Dr. Kalra assessed polycystic ovary syndrome and ordered a pelvic ultrasound. (Tr. 281.) The ultrasound was unremarkable. (Tr. 447.)

Griffith next saw Dr. Goleba for severe back pain. (Tr. 414.) Griffith, who stands 5' 6" tall, weighed 277 pounds and Dr. Goleba noted morbid obesity. (*Id.*) She ordered an MRI to rule out disc herniation. (Tr. 414.) A lumbar-spine MRI revealed a moderately large disc protrusion at L5-S1, a diffuse central disc protrusion with minimal indentation of the thecal sac at L4-L5 and mild narrowing of the spinal canal. (Tr. 451.) In July 2009, Dr. Goleba saw Griffith for a follow-up on the MRI and laboratory results. (Tr. 412.) Although Dr. Goleba's handwriting is difficult to read, it appears that she assessed lumbar disc herniation and to rule out ulcers, and prescribed physical therapy, Desyrel (Trazodone), Vicodin, and Valium. (Tr. 412.)

In September 2009, Griffith again slipped and fell and hurt her back. (*See* Tr. 329, 410.) X-

5

rays, apparently taken at the emergency room, were negative. (*See* Tr. 329, 410.) At a follow-up, Dr. Goleba assessed "[illegible] lumbar strain and lumbar [illegible]." (Tr. 410.) In late September, Griffith was given an injection and assessed for physical therapy. (Tr. 268.) Griffith told the physical therapist that her pain had flared to ten out of ten in the prior two weeks, with an average of four; she was not in pain at the time of the evaluation, however. (*Id.*) Upon completing an evaluation, the physical therapist provided, "The patient presents with pain in the low back that is inconsistent in nature. The patient does have an MRI report which states disc protrusion in the back. The patient is not presenting with any type of neuro symptoms at this time." (Tr. 270.) In late October 2009, the therapist discharged Griffith from therapy because Griffith had not returned phone calls to schedule her appointments. (Tr. 271.)

In November 2009, Dr. Kalra noted that Griffith had been bleeding since September. (Tr. 260.) She diagnosed dysmenorrhea and abnormal uterine bleeding and performed a hysteroscopy and dilation and curettage. (Tr. 258, 261.) In February 2010, Dr. Kalra informed Dr. Goleba that Griffith's "periods [were] getting slightly better and she [was] getting better with pain as well." (Tr. 292.)

Between November 2009 and February 2010, Griffith received treatment for her back pain from Dr. Kavitha Reddy. In November, Griffith described intermittent soreness and aching, and occasional sharp, stabbing lumbosacral pain that radiated into her right buttock and thighs. (Tr. 305.) Griffith rated her pain at the five-out-of-ten level. (*Id.*) Dr. Reddy provided injections on December 18, 2009, January 8, 2010, and January 22, 2010. (Tr. 299-304.) In February 2010, Griffith reported that the injections improved her condition by 50% and that her pain was down from the nine-out-of-ten level to the five-out-of-ten level. (Tr. 296.) On exam, Griffith's gait was normal and her lumbar

range of motion was full and flexion was without pain. (Tr. 298.) Dr. Reddy's assessment was acute low back pain, lumbar disc protrusion, right lumbar radiculopathy, and associated depression and anxiety. (Tr. 298.) Griffith was to continue her home exercise program, and Dr. Reddy recommended physical therapy and Ultram on an as-needed basis. (*Id.*)

In January 2010, Griffith saw Dr. Madan Arora for her anemia. (Tr. 290.) Dr. Arora concluded, "[Ms. Griffith] clearly has microcytic anemia due to iron deficiency. The cause is heavy menstruation." (Tr. 291.) She prescribed intravenous iron (because Griffith could not tolerate iron orally). (*Id.*)

In February 2010, Griffith saw Dr. Goleba for ear pain and to have paperwork completed. (Tr. 406.) On a "Physical Capacities Assessment" form supplied by Michigan's Rehabilitation Services (a state agency that helps people with physical or mental limitations "prepare for, find and maintain jobs"), Dr. Goleba provided diagnoses of "ADD" (attention deficit disorder), anxiety, and morbid obesity. (Tr. 358.)[2] Dr. Goleba opined that Griffith could sit, stand, and walk "frequently," which the form defined as "continuously for up to [eight hours] with breaks." (*Id.*) She thought that Griffith could lift at most 25 pounds "sometimes," which the form defined as "continuously up to [two hours] or occasionally up to [six hours]." (*Id.*) Dr. Goleba also thought that Griffith should avoid working with machinery and driving due to her "ADD." (*Id.*)

In March and April 2010, Griffith saw Heather Decker, a physician assistant in Dr. Arora's office, for her anemia. (Tr. 365.) Griffith reported that she still felt fatigued and that she had started having two or three nosebleeds per week. (Tr. 364.) Decker noted, "She is still having heavy

---

[2]On another form completed the same day, Dr. Goleba's diagnoses were anxiety disorder, morbid obesity, and Asperger's Syndrome. (Tr. 357.) It may be that Dr. Goleba equated Asperger's with ADD.

menstrual bleeding, prolon[g]ed." (*Id.*) She provided, "we will continue IV Venofer 200 mg five additional doses over the next two weeks." (*Id.*) At the April follow-up, Decker noted that Griffith's anemia was improving. (Tr. 454.) Griffith, who had a cold, complained of fatigue, depression, anxiety, occasional headaches, sore throat, and some muscle and joint pain. (*Id.*)

In May, June, and July 2010, Griffith saw Dr. Goleba for various reasons. In early May, Griffith sought treatment for an allergic reaction. (Tr. 404-05.) Later in the month, Griffith had a follow-up with Dr. Goleba after being treated in the emergency room for an ear infection. (Tr. 403.) In June, Griffith saw Dr. Goleba because of vomiting. (Tr. 402.) Dr. Goleba assessed GERD, nausea, and abdominal pain and noted something about a "bariatric institute." (Tr. 402.) In July 2010, Griffith had a follow-up for her knee pain. (Tr. 628.) Dr. Goleba noted a full range of motion. (*Id.*) In a section of the form Dr. Goleba always used to record her exam notes, Dr. Goleba indicated that Griffith's "psy" was within normal limits and did not select options for anxiety, depression, mood swings, or stress. (*Id.*)

On August 13, 2010, Griffith had a follow-up appointment with Dr. Goleba for morbid obesity, GERD, and "Autizm," and to have Dr. Goleba complete a disability form. (Tr. 627.) Using her standardized treatment note, Dr. Goleba indicated anxiety, depression, mood swings, and stress in the "psy" category. (*Id.*) On a "Medical Assessment of Ability To Do Work Related Activities (Physical)" form, Dr. Goleba provided diagnoses of "Autizm" and "morbid obesity." (Tr. 553.) In terms of symptoms, Dr. Goleba provided "mental impairment, limited ambulation[,] [pelvic inflammatory disease]—dysmenorrhea." (Tr. 553.) She provided that Griffith had no lifting or carrying limitations, could walk for a total of one hour (uninterrupted) in an eight-hour day, and sit for a total of one hour (uninterrupted) in an eight-hour day. (Tr. 553-54.) Dr. Goleba opined that

8

Griffith would need to take three to four unscheduled breaks during the work day. (*Id.*) She further provided that Griffith's pain or other symptoms were severe enough to "constantly" interfere with the attention and concentration needed to perform "even simple work tasks." (Tr. 555.)

In November and December 2010, Griffith saw Dr. Arora for follow-up care for her anemia. (Tr. 568, 572.) In November, Griffith reported that she still had heavy menstruation. (Tr. 572.) She complained of trouble sleeping, fatigue, and tiredness. (*Id.*) Griffith also complained of mild nausea and vomiting, mild dizziness and difficulty hearing, and aches and pains in her joints. (*Id.*) Dr. Arora provided another course of iron and ordered laboratory results. (*Id.*) In December 2010, Dr. Arora noted, "[h]er menstruation has become somewhat light now." (Tr. 568.) Griffith complained of anxiety and mild dizziness but did not report nausea or vomiting or other symptoms. (*Id.*)

By February 2011, Griffith began treating with Dr. Sai Bikkina for her anemia (Dr. Bikkina's office was closer than Dr. Arora's). (*See* Tr. 616.) Griffith reported feeling tired and experiencing some dizziness. (Tr. 616.) Dr. Bikkina's impression: "The patient with history of iron deficiency anemia in the past and heavy periods." (Tr. 616.) Dr. Bikkina advised Griffith to follow up with her gynecologist and planned to repeat Griffith's blood testing to see if iron supplementation was necessary. (Tr. 617.)

### 2. Treatment for Mental or Emotional Impairments

In January 2009, Griffith, then 18 years old, saw Allan Thorburn, a psychiatrist, for the first time. (Tr. 483, 485.) Griffith was accompanied to the appointment by her mother and her therapist, Alicia DeWolfe, MS, LLPC. (Tr. 484; *see also* Tr. 225, 558.) Dr. Thorburn noted, "She speaks of . . . [the] need to have things in an orderly manner and a need to do things over, often. . . . She is cooperative and she repeatedly says that she is a failure if she can't do something and she apologizes

for things that she doesn't need to apologize for." (Tr. 484.) Dr. Thorburn prescribed a trial of Prozac to address Griffith's "obsessive-compulsive symptoms and depressive symptoms." (Tr. 485.)

In February 2009, DeWolfe wrote a letter to Griffith's school. She informed, "Bridgette Griffith . . . is my consumer here at Lapeer County Community Mental Health and has been attending regular sessions. She has been diagnosed by one of our Agency Doctors as having Asberger's [*sic*] Disorder." (Tr. 225.) She then described the symptoms of the disorder: "problems with peers and in understanding social norms and non-verbal communication, mood difficulties, persistent patterns of behavior that may keep a person from other, more socially appropriate behaviors, and that these difficulties are clinically significant and make the person 'stand out' from their peers." (*Id.*)

Griffith had a medication review with Dr. Thorburn in June 2009. (Tr. 488-89.) Griffith reported anxiety with final exams upcoming. (Tr. 488.) Griffith was doing some babysitting, planned to take driver's education, and noted that she wanted to go to college and study anthropology. (Tr. 488.) Dr. Thorburn remarked that Griffith "seem[ed] intellectually equipped to do that." (*Id.*)

In July 2009, Griffith, along with her mother and therapist, saw Dr. Thorburn for a medication review. (Tr. 486-87.) Dr. Thorburn noted, "[S]he's cooperative, very verbal and continually objecting to her mother interjecting comments and information that Bridgette contests that she would provide herself if allowed to." (Tr. 486.) Griffith reported sometimes being obsessed with details to the detriment of task completion and that she had problems paying attention or focusing at times. (Tr. 486.) Dr. Thorburn noted, "[s]he speaks [of] responsibility but continues to be quite dependent." (*Id.*) Dr. Thorburn added Trazodone to Griffith's prescription for Prozac. (*Compare* Tr. 486, *with* Tr. 489.)

10

In September 2009, Griffith's Individualized Education Program ("IEP") Team met to determine Griffith's special education eligibility. (Tr. 234-35.) The IEP Team's report noted that Griffith had recently taken the Woodcock-Johnson Test of Achievement, III. (Tr. 237.) Her performance was high average in reading and written expression, average in written language, and low average in mathematics. (Tr. 237.) As examples, in the area of "passage comprehension" Griffith's age-equivalent score was greater than 31 years old, but in math fluency, only 11 years and seven months. (Tr. 237.) The IEP Team indicated some low grades but explained, "These grades are low because Gigi has not been in school due to a back injury. . . . . The present grades do not reflect [her] ability. Medical issues and medical disorders continue to interfere with her demonstration of knowledge attained. She has difficulty coming to school on a regular basis. These factors put Gigi behind in her school work." (Tr. 239.) The IEPT noted that Griffith experienced social problems with her peers and adults: "She appears to have trouble understanding social norms and non-verbal communication. These difficulties often are demonstrated by frequent interruptions of the classroom setting. Gigi appears to feel like she has to answer all questions posed by the teachers not allowing others to respond. The social and medical areas seem[] to be much more problematic than the academic areas at this point." (Tr. 239.) In October 2009, Griffith took the ACT. (Tr. 214.) Her composite score was better than 68% of test takers. (*Id.*) Her math score was only a 14 out of 36, but her reading score was a 32 out of 36. (*Id.*) Griffith was given time-and-a-half to complete the exam. (Tr. 247; *see also* Tr. 241.)

Griffith had a follow-up appointment with Dr. Thorburn in October 2009. (Tr. 490.) She reported that she was "now on a homebound teaching program while some investigations are being done to determine the cause for her persistent vomiting." (Tr. 490.) Griffith was "very vocal, talk[ed]

11

about herself and her aspirations pretty confidently." (*Id.*) Griffith reported that her medications were helpful and there was no need to change them. (*Id.*)

In January 2010, Griffith told Dr. Thorburn about possibly moving into a more independent living situation, such as a halfway house. (Tr. 492.) Griffith reported that Prozac had been helpful, particularly for her depression. (*Id.*) Dr. Thorburn noted, "She feels that the diagnosis of autistic spectrum disorder and depression are the appropriate diagnosis though in the past she's been diagnosed bipolar." (*Id.*) Dr. Thorburn noted that Griffith had not described any manic-like symptomology. (*Id.*) Griffith also thought that a diagnosis of obsessive-compulsive disorder may be appropriate, but Dr. Thorburn noted, "she doesn't describe any compulsive repetitive behavior." (Tr. 492.) Dr. Thorburn explained, "[S]he just has differences of opinion, particularly with her mother about the way that things should be done and she's persistent about wanting them that way. That apparently has been thought to define her compulsive behavior. Currently the diagnoses appear to be Asperger's and depression with oppositional behavior prominent." (*Id.*)

In April 2010, Griffith noted that she had taken the GED and was anticipating starting college. (Tr. 494.) Dr. Thorburn noted, "She seems a little grandiose. She discusses a network of friends, all on the internet[,] and they are planning activities . . . that apparently don't involve getting together at this time. Whether she has any actual friends that she sees and does anything with I'm uncertain about." (*Id.*)

Griffith next saw Dr. Thorburn in July 2010. (Tr. 496.) She was accompanied by her mother. (*Id.*) Griffith reported using some of her mother's Valium to calm down during an anxious period. (*Id.*) Griffith mentioned possible bariatric surgery. (*Id.*) Dr. Thorburn wrote, "She is grossly obese and surgery would probably be helpful for her physically, personality wise she speaks confidently

and seems like she wants to be more socially active and surgery may make that more possible for her[,] [but] whether or not in fact . . . she's able to utilize it may be another question." (*Id.*) Dr. Thorburn continued Prozac and Trazodone. (*Id.*)

In June 2010, Matthew Dickson, Ph.D., a psychologist, evaluated Griffith for the Michigan Disability Determination Service, a state agency that helps the Social Security Administration assess claimants. (Tr. 476-79.) Griffith reported her symptoms as follows: "I have Asperger's. I used to be agoraphobic. I have really bad panic attacks. For the last 3 days I've had one continuous panic attack. It feels like someone is squeezing my heart. I get agitated and freak out. It feels like the walls are closing in. Lately it's been pretty good, but it came a few days ago. I haven't been able to sleep or eat." (Tr. 476.) Dr. Dickson noted that Griffith "was not having a panic attack during the exam." (*Id.*) Griffith further provided, "I'm not good with people. I get freaked out with people. I'm awkward around people. I used to get sick and have panic attacks about going to school. I was throwing up every day. I had to drop out of school in my senior year. I got my GED and I'm in college at Mott. I did OK in one class. I had to drop one because I got a double ear infection. I get worried easily." (*Id.*) Griffith also stated that she sometimes said the wrong things or overreacted. (Tr. 477.) Dr. Dickson noted that Griffith was "basically socially appropriate during [the] exam but was awkward and immature." (*Id.*) "She seemed nervous and asked for reassurance in an immature, affected voice." (*Id.*) Dr. Dickson also took Griffith's personal history, had Griffith describe her daily activities, and conducted a mental-status exam. (Tr. 476-78.) Dr. Dickson opined,

> It is my impression that Bridgette's mental abilities to understand, attend to, remember, and carry out instructions are not impaired. Bridgette's abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are moderately impaired. Overall, based on today's exam and all the information available to me at this time, it is my impression that

13

> Bridgette's psychological condition would moderately impair her ability to perform work related activities. Bridgette seems capable of unskilled work.

(Tr. 479.)

In July 2010, Blaine Pinaire, Ph.D., reviewed Griffith's medical file, which, at the time of his review, did not include Dr. Thorburn's notes. (Tr. 523-40; *see also* Tr. 539, 575.) Dr. Pinaire opined,

> There are moderate limitations relative to the appropriate responding to supervision, coworkers, with work situations; and dealing with changes in a routine work setting. There are no significant problems with attention. There is sufficient concentration to perform simple 1-2 [step] tasks, all on a routine and regular basis. This claimant is capable of unskilled tasks.

(Tr. 525.)

On August 25, 2010, DeWolfe, who had been Griffith's counselor since November 2008, completed a "Medical Assessment of Ability To Do Work Related Activities (Mental)" form. (Tr. 557-58.)[3] She provided that Griffith had "marked" limitations ("the individual cannot usefully perform or sustain the activities") in a number of the areas, including maintaining concentration for extended periods; performing activities with a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without supervision; accepting instructions and responding appropriate to criticism from supervisors; and responding appropriately to changes in the work setting. (Tr. 557.) DeWolfe remarked, "Bridgette has trouble [with] criticism, change [and] appropriate interaction. She is easily confused." (Tr. 558.) She also wrote, "Bridgette

---

[3]Griffith's brief indicates that this form was completed by Dr. Thorburn. (Pl.'s Mot. Summ. J. at 7.) Although the signature is somewhat difficult to read, it is clear enough that it was completed by DeWolfe. (*Compare* Tr. 558, *with* Tr. 561.)

14

has trouble interacting [with] others in work/social situations." (*Id.*)

Also on August 25, 2010, Dr. Thorburn completed a "Medical Questionnaire." (Tr. 560-61.) He provided that Griffith's diagnoses were Asperger's Syndrome, Dysthymia, Learning Disorder (not otherwise specified), and Obsessive-Compulsive Personality Disorder. (*Id.*) He wrote that Griffith's symptoms were mood swings, dependency issues, "peer inapprop[riate] behaviors," depression, and anxiety. (*Id.*) When asked if Griffith had "any functional limitations" due to her medical conditions, Dr. Thorburn answered, "Yes. Limited in peer/social interactions. LD [Learning Disability]." (*Id.*) When asked if Griffith was capable of performing a full-time job on a sustained basis, Dr. Thorburn provided, "No. Trouble maintaining focus, inappropriate peer interactions." (Tr. 561.)

In September 2010, Griffith saw Dr. Thorburn for a medication review. (Tr. 613-14.) Griffith reported that anxiety had recently required her to return early from a trip she had taken to Atlanta by herself. (Tr. 613.) In terms of Griffith's mental status, Dr. Thorburn wrote, "One would think that there had been no problem at all and that there was no problem from Bridgette's demeanor today." (Tr. 613.) Griffith thought Trazodone was helping, but reported that her mother disagreed. (*Id.*) Griffith had returned to college and was taking three courses. (*Id.*) Dr. Thorburn remarked, "The discrepancies between what Bridgette says and what her mother says are going on are sufficiently confusing and confounding as to suggest that psychological testing might be helpful in resolving some of these differences and reasons for them." (Tr. 613.)

In November 2010, DeWolfe completed an annual treatment report. (Tr. 598-607.) She wrote, "Consumer continues to have social problems/anxiety and trouble in school. She and mom continue to fight/are enmeshed." (*Id.*) In responding to a question about her leisure time, Griffith

stated that she would talk for an hour with her mother or with her friends online, would make herself meals, and sometimes play "brain games" to improve her memory. (Tr. 601.) Griffith also told DeWolfe, "I go on the computer—my friends write fan fiction, and they ask me to read their stuff and tell them that they should add this or fix that. I read . . . books or articles online. . . . I'll do laundry—I love laundry. I do dishes, I clean the house if I remember, play with the kitties, spend time with my mom." (*Id.*) But DeWolfe wrote "[d]oes not participate much in house chores . . . ." (*Id.*) In a section of the form asking DeWolfe to identify major illnesses, she provided, "[v]omiting several [times/week], [primary care physician] states it may be anxiety related." (Tr. 603.) In terms of Griffith's mental status, DeWolfe provided that Griffith's behavior was socially inappropriate and that she was anxious with racing thoughts. (Tr. 604.)

At her December 2010 medication review with Dr. Thorburn, the psychiatrist noted, "She asks for something for anxiety, as she's stressed with decisions about the [bariatric] surgery, stressed about return[ing] to school, which she wants to do . . . . She says she dropped out because she was stressed by the 3 classes that she had been taking previously. She's a very bright girl, but a very dependent girl also. Her mother is able to threaten her with her own illness, having attempted suicide recently. Bridgette feels that she can't separate from her mother." (Tr. 596.) Dr. Thorburn continued Prozac and Trazodone, but added Abilify. (Tr. 596.)

In January 2011, Griffith started with a new therapist, Elizabeth Kellaway, LMSW. (Tr. 585-95.) Kellway summarized some of Griffith's childhood history: her father left when she was three years old, her and her mother moved constantly, and, in the seventh grade, Griffith, then 13 years old, was enrolled in a large school, which terrified her and led to inpatient treatment. (Tr. 587.) Griffith reported that her mother was an alcoholic and depended on her for emotional support; she

16

said they were "enmeshed." (*Id.*) Regarding major illnesses, Kellaway wrote "[v]omiting several [times/week], [primary care physician] states it is anxiety related, that she vomited at school in the bathrooms." (Tr. 590.) Kellaway noted that Griffith's behavior was socially inappropriate and that, in terms of judgment, she appeared emotionally younger than her age. (Tr. 591-92.)

Griffith returned to Dr. Thorburn in February 2011. (Tr. 576.) Griffith reported feeling tired and Dr. Thorburn noted that she had "very irregular hours of sleep." (*Id.*) Griffith was ambivalent about bariatric surgery, but reported working with Dr. Goleba on various approaches to weight loss. (Tr. 576.) Dr. Thorburn's diagnoses were Dysthymic Disorder, Learning Disorder (not otherwise specified), Asperger's Syndrome, and Obsessive-Compulsive Personality Disorder. (Tr. 576.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a

17

continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

The ALJ applied this five-step framework as follows. At step one, the ALJ found that Griffith had not engaged in substantial gainful activity since the alleged disability onset date of January 28, 2010. (Tr. 12.) At step two, he found that Griffith had the following severe impairments: dysthymia, anxiety, obesity, anemia, polycystic ovarian syndrome, mild osteoarthritis of the knee, and degenerative disc disease. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 13-14.) Between steps three and four, the ALJ determined that Griffith had the physical residual functional capacity to lift and carry a maximum of 10 pounds frequently and 20 pounds occasionally; "stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday"; "sit (with normal breaks) for a total of about 6 hours in an 8-hour workday"; push and pull; "occasionally climb ramps and stairs, never ladders, ropes or scaffolds"; "occasionally balance, stoop, kneel, crouch, crawl and twist." (Tr. 14.) The ALJ determined that Griffith had the mental residual functional capacity to perform jobs

that were simple, unskilled, low stress, without fast-paced production, and allowed a work break "approximately every [two] hours." (Tr. 15.) Additionally, Griffith was "limited to work where contact with others is routine, superficial, and incidental to the work performed." (Tr. 15.) Relying on testimony from a vocational expert that someone with these limitations could work as a housekeeper or hand sorter (Tr. 62-64), the ALJ found at step five that sufficient jobs existed in the national economy for someone of Griffith's age, education, work experience, and residual functional capacity. (Tr. 19-20) The ALJ therefore concluded that Griffith was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 20.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)

(en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Griffith raises multiple, related claims of error. The Court turns first to her lead argument: that the ALJ wrongly concluded that her Asperger's Syndrome was not a severe impairment, and that this error resulted in a flawed step-three analysis and residual functional capacity assessment. (Pl.'s Mot. Summ. J. at 12-15, 20.) The Court then addresses Griffith's assertion that the ALJ erred by discrediting the opinion of her primary-care physician, Dr. Goleba. (Pl.'s Mot. Summ. J. at 18-19.) Next, the Court examines Griffith's argument that the ALJ did not adequately address her obesity and failed to incorporate the effects of that condition into her residual functional capacity assessment. (*Id.* at 16.) The Court then turns to Griffith's claims that the ALJ erred by failing to address her mother's testimony and in discounting her credibility. (Pl.'s Mot. Summ. J. at 16-18.)

20

Finally, the Court addresses Griffith's claim that the limitations that the ALJ asked the vocational expert to consider did not accurately portray her limitations. (Pl.'s Mot. Summ. J. at 20, 22.)

After a careful review of these claims of error, the Court concludes that none justify remand.

### A. The ALJ's Consideration of Griffith's Asperger's Syndrome

Griffith argues that the ALJ incorrectly concluded that her Asperger's Syndrome was not a severe impairment at step two, and that this error tainted later steps of his analysis. (Pl.'s Mot. Summ. J. at 11-15.) The Court agrees with Griffith that the ALJ erred in concluding that her Asperger's Syndrome was not a severe impairment. But the Court concludes that Griffith has not shown that this error resulted in a flawed step-three analysis or a flawed residual functional capacity assessment.

The ALJ questioned Griffith's diagnosis of Asperger's Syndrome because he believed that it was not supported by the record: "Although the record includes a diagnosis of Asperger's Syndrome, the exam records do not support the diagnosis and appear to be based on statements by the claimant's mother that her daughter was previously diagnosed with the disorder." (Tr. 17.) The ALJ continued,

> For example, at therapy in November 2010, the claimant's mother stated as follows: "I think she is an Asperger's Autism. I researched it and I think she really fits that . . . I need her to get that diagnosis from your psychiatrist and get her meds changed" (Ex. 27F:24). On October 2010 records, the comments section states that the claimant "thinks she has Asperger's syndrome" (Ex. 27F:31). The claimant also told school officials in March 2009 that her daughter had been diagnosed with the condition, although the education records include no evaluation by a psychologist or psychiatrist at the time that include the diagnosis (Ex. 2F:25).

(Tr. 17.)

The foregoing reasoning is flawed. It is true that at the outset of her treatment with Dr.

21

Thorburn, the psychiatrist believed that Griffith had obsessive-compulsive and depressive symptoms, and, at that time, the diagnosis of Asperger's was by a counselor, not Dr. Thorburn. (Tr. 484.) Further, in March 2009, Dr. Thorburn provided only a "rule out" diagnosis of Asperger's. (Tr. 488.) But in January 2010, Dr. Thorburn's diagnosis evolved. Griffith expressed that she thought diagnoses of autistic spectrum disorder, depression, and obsessive-compulsive disorder were appropriate, and also mentioned a past diagnosis of bipolar disorder. (Tr. 492.) Dr. Thorburn did not uncritically accept Griffith's self-assessment: he provided that Griffith did not meet the criteria for bipolar disorder or obsessive-compulsive disorder and opined that "the diagnoses appear to be Asperger's and depression with oppositional behavior prominent." (Tr. 492.) And by the time he completed the Medical Questionnaire in August 2010, Dr. Thorburn was unequivocal: he provided diagnoses of dysthymia, learning disorder, obsessive-compulsive personality disorder, and Asperger's Syndrome. (Tr 560.) In September 2010, Dr. Thorburn provided the same four diagnoses. (Tr. 613.) Notably, Dr. Thorburn's August and September 2010 diagnoses pre-date the October 2010 treatment record where DeWolfe noted that Griffith "thinks she has Asperger's syndrome." (Tr. 605.) They also pre-date her mother's "I need her to get that Diagnosis" statement made in November 2010. (Tr. 598.) Further, given that Dr. Thorburn was the medical expert most familiar with Griffith, and that no medical expert opined that Griffith did not have Asperger's, substantial evidence does not support the ALJ's conclusion that Griffith did not have a confirmed diagnosis of Asperger's Syndrome.

So the question becomes whether the ALJ's error was harmful. If the ALJ reasonably accounted for Griffith's functional limitations attributable to Asperger's Syndrome in his disability analysis, a remand would be neither necessary nor productive. *See Rabbers v. Comm'r Soc. Sec.*

*Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error. . . .). Because Griffith acknowledges that the ALJ did not commit harmful error by failing to include Asperger's as a severe impairment at step two (Pl.'s Mot. Summ. J. at 11-12), the Court proceeds to examine the ALJ's step-three analysis and assessment of Griffith's mental residual functional capacity.

### 1. Step Three

Griffith says that the ALJ's failure to acknowledge her diagnosis of Asperger's resulted in harmful error at step three. (Pl.'s Mot. Summ. J. at 12, 14-15.) The Court disagrees.

Griffith first makes a procedural argument. She asserts that "there is no analysis whatsoever as to whether Plaintiff's impairments met or equaled . . . Listing . . . 12.10 with regards to the Asperger's syndrome, despite the fact that it was Counsel's primary argument [before the ALJ]." (Pl.'s Mot. Summ. J. at 14.) Griffith relies on *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011), and similar cases to argue that remand is required because the ALJ did not adequately articulate whether Griffith's Asperger's Syndrome met or medically equaled a listed impairment. (*See id.* at 15.)

This case is nothing like *Reynolds*. There, the ALJ "skipped an entire step of the necessary analysis" by failing to address whether an impairment met or equaled an applicable listing. *See Reynolds*, 424 F. App'x at 414-16. Here, the ALJ provided an analysis of Listing 12.10, which is the listing that covers "Autistic disorder and other pervasive developmental disorders." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.10. The ALJ explicitly stated, "The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.06 and 12.10. In making this finding, the undersigned has considered whether the

23

'paragraph B' criteria are satisfied." (Tr. 13.) The ALJ then went on to address each of the four "B" criteria associated with Listing 12.10 concluding that Griffith had moderate restrictions in activities of daily living, social functioning, and concentration, persistence, or pace, and had no episodes of decompensation of extended duration. (Tr. 13-14.) Accordingly, Griffith has not demonstrated procedural error at step three.

Griffith also makes something of a substantive step-three argument. She asserts that because the ALJ incorrectly concluded that she did not have a confirmed diagnosis of Asperger's, the ALJ did not "evaluate[] the issues of 'inappropriate peer interactions' or 'trouble maintaining focus'" at step three. (Pl.'s Mot. Summ. J. at 12.) Because Griffith experienced no episodes of decompensation during the disability period, to show substantive error at step three, Griffith must demonstrate that substantial evidence does not support two of the ALJ's three "moderate" B criteria findings. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.10 (requiring, for satisfaction of the listing, that the claimant have two of marked limitations in activities of daily living; marked limitations in social functioning; marked limitations in concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration).

Griffith has not carried this burden. Griffith's argument is based on Dr. Thorburn's August 2010 opinion; in answering a question about whether Griffith could work a full-time job, Dr. Thorburn stated, "No. Trouble maintaining focus, inappropriate peer interactions." (Tr. 561.) These two limitations pertain to the social functioning and concentration, persistence, or pace B criteria of Listing 12.10. Although the ALJ did not address Dr. Thorburn's opinion at step three, the ALJ did address his opinion elsewhere in the narrative. The ALJ explained that Dr. Thorburn's conclusion that Griffith could not work was not supported by the record, but that his opinion that

24

Griffith had "trouble maintaining focus" and "inappropriate peer interactions" was entitled to "some" weight. (Tr. 18.) Griffith does not say why this assessment was error. The ALJ also explained that his residual functional capacity assessment of Griffith accounted for Dr. Thorburn's limitations. (*Id.*) Griffith also does not say why this was error. And it is not plain that someone with Griffith's mental residual functional capacity—someone capable of simple, unskilled, low-stress work that does not involve fast-paced production and allows breaks approximately every two hours—would have "marked" limitations in concentration, persistence, or pace. (Tr. 14-15.) Indeed, the Administration describes someone capable of simple tasks, but with a marked limitation in concentration, persistence, or pace, as more limited:

> [I]f you can complete many simple tasks, we may . . . find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(c)(3). Further, the ALJ's moderate rating in concentration, persistence, or pace was based in part on Dr. Dickson's opinion that Griffith's "psychological condition would moderately impair her ability to perform work related activities." (Tr. 479.) Griffith has not challenged the ALJ's assignment of "significant" weight to Dr. Dickson's opinion. In all then, Griffith has not shown that the ALJ erred in concluding that Griffith had only "moderate" limitations in concentration, persistence, or pace. It follows that even if the ALJ erred in not assigning Griffith a "marked" limitation in social functioning, that error was harmless.

Accordingly, because the ALJ addressed the listing that applied to Griffiths' Asperger's Syndrome, and because Griffith has not shown that the ALJ's application of that listing lacks substantial evidentiary support, Griffith's claim that the ALJ erred in assessing her Asperger's

Syndrome at step three does not warrant remand.

### 2. The ALJ's Mental Residual Functional Capacity Assessment

In order to determine whether the ALJ adequately addressed the functional limitations associated with Griffith's Asperger's Syndrome in assessing Griffiths' residual functional capacity, it is necessary to determine which functional limitations stemmed from that disorder. Unfortunately, neither the ALJ's narrative nor the parties' briefs provide significant guidance on this issue. The Court therefore turns to the record.

At the hearing, when the ALJ specifically inquired about the symptoms attributable to Asperger's, Griffith testified that the disorder caused her to blurt things out, to have difficulties with people her age, and to interrupt people. (Tr. 57-58.) Griffith's mother added that, due to Asperger's, Griffith asked inappropriate questions, had odd mannerisms, and sometimes dressed inappropriately. (Tr. 58.)

The ALJ's residual functional capacity assessment reasonably accounts for these symptoms. In particular, the ALJ limited Griffith to "contact with others [that] is routine, superficial, and incidental to the work performed." (Tr. 15.) Griffith has not explained how interrupting people and asking them inappropriate questions would preclude work where her contact with people would be non-substantive. As such, the Court finds that the ALJ's considerable restrictions on Griffith's contact with others in the workplace reasonably accounts for the social awkwardness she suffers from Asperger's Syndrome.

But Griffith now implies that her anxiety and panic attacks are also symptoms of her Asperger's Syndrome. (*See* Pl.'s Mot. Summ. J. at 12.) In one respect, this does not complicate the harmless-error analysis. Griffith and her mother testified to work or school stress that resulted in

26

vomiting. (Tr. 30, 34, 50.) But Griffith makes no argument that the ALJ's limitations of simple, low-stress work, without fast-paced production and allowing for breaks approximately every two hours does not fully accommodate for the stress that causes her to vomit. Without developed argument from Griffith, the Court declines to conclude that these substantial limitations do not reasonably account for Griffith's and Rumptz's testimony about stress-induced vomiting.

In another respect, however, Griffith's argument makes the harmless-error analysis more difficult. Her claim highlights the fact that the ALJ failed to explain how he accounted for the anxiety Griffith allegedly experiences when she is around people or her fear of leaving her home without her mother. Yet, at the hearing, the ALJ and Griffith clearly discussed that issue:

> [GRIFFITH:] [Y]ou asked why I couldn't work at McDonalds, and that would be the biggest problem, interacting with people. I would have a panic attack. *I'm not good with a lot of people*— . . . .
> [ALJ:] . . . And, all right, in addition your saying [you could not work at McDonalds] because of your Asperger's—is it Asperger's syndrome?
> A Uh-huh.
> Q Because you—you're—what problem do you have with people?
> A They frighten me. I'm just—*I'm very scared of a lot of people and large groups*. I'm slightly agoraphobic. And with my anxiety of being around and interacting with people, it gets so bad that it causes me to physically be ill, where I'm vomiting for, like, an hour, and I'm just dry-heaving. And it's not good. . . .
> Q Okay.
> A This chair is really hurting my back.
> Q Any other reason—any other symptoms you have that makes it hard for you to work?
> A *Besides my really bad anxiety, I have agoraphobia, and I don't like to leave my house.*
> Q Okay.
>
>                * * *
>
> [GRIFFITH:] I can leave my house now, but I just—I feel really anxious and uncomfortable, and I don't like to be very far from home. It upsets me.

27

(Tr. 33 (emphasis added).) Griffith also testified to being hospitalized at age 13 because of agoraphobia ("I wouldn't leave my room") and needing to be home-schooled in the ninth and tenth grades "because of all the people." (Tr. 40.) Relatedly, Griffith stated, "I don't like to be alone. It's—it freaks me out." (Tr. 36, 40.) Further, Griffith's mother testified that Griffith could not work because of "her issues with people and leaving the house. She has a very hard time being around people. She's had this most of her life. She gets very scared. And that, too, will bring around stress and fear; so then she'll throw up." (Tr. 51.)

The ALJ said nothing about this testimony. Although the ALJ listed anxiety as a severe impairment, he never discussed its cause and never explained how he accounted for it in his residual functional capacity assessment. And while the ALJ's restriction to routine, superficial, and incidental contact with others limits the type of interactions that Griffith would have to engage in, that restriction does not limit the number of people that Griffith would have to work around or the proximity of people around her while working.

Although the ALJ's failure to address Griffith's and Rumptz's allegations that Griffith feared leaving her home on her own and feared groups of people counsels toward remand, the record counsels against it. *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) ("[W]here the circumstances of the case show a substantial likelihood of prejudice [from the ALJ's error], remand is appropriate so that the agency 'can decide whether re-consideration is necessary.' By contrast, where harmlessness is clear and not a 'borderline question,' remand for reconsideration is not appropriate."); *cf. Rabbers*, 582 F.3d at 657-58 ("[I]n some cases it may be difficult, or even impossible, to assess whether an ALJ's failure to rate the B criteria was harmless. In such cases, the record may contain conflicting or inconclusive evidence relating to the B criteria. Or it may contain

28

evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider. As a result, courts generally should exercise caution in conducting harmless error review in this context.").

The Court begins with Griffith's school records, which suggest that Griffith had some ability to be in a class with other students and without her mother. Although Griffith and Rumptz testified to an episode of extreme agoraphobia when Griffith switched to a new, large school at the start of seventh grade, neither testified that Griffith was home-schooled for the remainder of seventh grade or that she was home-schooled for any part of eighth grade. The omission is telling given that both testified to home-schooling in the ninth and tenth grades. Further, although neither Griffith nor Rumptz disclosed it, Griffith's high-school transcript suggests that she attended classes, albeit with 43 absences, during her second year of 10th grade (the 2008-09 school year). (Tr. 211.)  Indeed, in February 2009, DeWolfe wrote a letter to Griffith's high school about accommodating Griffith's Asperger's, and a June 2009 report card provides that Griffith "participate[d] well in class" but was "tardy too often" and "absent too often." (Tr. 213.) The IEP Team report prior to the 2009-10 school year mentions missed classes due to medical issues and Griffith's difficulties with developing friends (Tr. 238), but does not mention that Griffith had anxiety around other students (*see generally* Tr. 234-49). Instead, the IEP Team noted, "Gigi appears to feel like she has to answer all questions posed by the teachers not allowing others to respond." (Tr. 239.) Although Griffith dropped out of school in the fall of the 2009-10 school year, it is not clear that it was due to anxiety from being around her classmates; Griffith testified, "my gastro doctor and my therapist suggested that it might be stress-related because I was constantly trying to keep up with school, and I kept falling behind because of illness." (Tr. 34.) Griffith says that she only attended college for two weeks in September

29

2010 and her mother stayed on campus because Griffith "could not stand to be alone." (Pl.'s Mot. Summ. J. at 12.) Although Griffith did drop out of three college classes due to stress in the fall of 2010, it is again not clear from the record that this stress was induced by agoraphobia. (*See* Tr. 596.) And Griffith cites no record support for her assertion that her mother stayed on campus while she attended classes. Further, Griffith fails to mention that she completed one (albeit short) college course in the spring of 2010 (earning an "A") and dropped out of another because of ear infections. (*See* Tr. 476, 494, 496.)

Moreover, Griffith's medical records simply do not support severe agoraphobia. First, in her exam with Dr. Dickson, although Griffith provided that she got "freaked out with people," she also provided that she "used to be agoraphobic." (Tr. 476.) And Dr. Dickson did not diagnose agoraphobia. (Tr. 479.) Second, and stronger, Dr. Thorburn never diagnosed agoraphobia. In fact, Dr. Thorburn, although listing it as a symptom in his August 2010 opinion, never even diagnosed Griffith with anxiety. In the first year of treatment, Griffith was diagnosed with dependent personality disorder (Tr. 488, 490), but at that time, Griffith's diagnoses were not solidified and subsequent diagnoses do not include that disorder (Tr. 493, 496). It is true that Griffith reported needing to return home early from her solo trip to Atlanta, but at the follow-up exam, Dr. Thorburn remarked, "One would think that there had been no problem at all and that there was no problem from Bridgette's demeanor today." (Tr. 613.) Third, and strongest, in November 2010, after treating Griffith for over two years, DeWolfe diagnosed Griffith with major depression, obsessive-compulsive disorder, and panic disorder *without agoraphobia.* (Tr. 605.) Although likely relying in part on DeWolfe's prior assessment, Kellaway provided the same diagnoses a couple months later. (Tr. 593.) In other words, Griffith's medical records do not corroborate her or Rumptz's allegations

of severe agoraphobia.

Finally, as discussed separately below, the ALJ had a valid basis for discounting Rumptz's testimony.

In short, while the ALJ erred in concluding that Griffith was not diagnosed with Asperger's Syndrome, Griffith has not shown that his residual functional capacity assessment, with substantial restrictions on stress, concentration, persistence, and pace, and contact with others, does not fully accommodate the symptoms associated, or even arguably associated, with Griffith's Asperger's Syndrome. Accordingly, the Court finds no harmful error in the ALJ's treatment of Griffith's Asperger's Syndrome.

### B. The ALJ's Assessment of Dr. Goleba's Opinion

The parties do not dispute, and the record makes apparent, that Dr. Goleba was a "treating source" as that term is used in the context of social security law. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" (quoting 20 C.F.R. § 404.1502)). As such, a special rule applied to her opinion. In particular, her opinion was entitled to "controlling" weight if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2) (formerly 20 C.F.R. § 404.1527(d)(2)). Further, where a treating physician's opinion is not entitled to "controlling" weight, there remains a rebuttable presumption that the opinion is entitled to "great deference." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. An ALJ must provide the claimant and a

31

reviewing court with "good reasons," supported by substantial evidence, for not deferring to a treating-source opinion. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Rogers*, 486 F.3d at 243.

Griffith argues that the ALJ erred in rejecting Dr. Goleba's August 2010 opinion. (Pl.'s Mot. Summ. J. at 18-19.) In August 2010, Dr. Goleba thought that Griffith could stand or walk for only one hour in an eight-hour day, could sit for only one hour in an eight-hour day, and had no lifting limitations. (Tr. 553-54.) But in February 2010, Dr. Goleba provided that Griffith could sit, stand, and walk "frequently" (continuously up to eight hours with breaks) and was limited to "sometimes" (continuously for two hours or occasionally for six hours) lifting 25 pounds. (Tr. 358.) The ALJ reasoned, "Dr. Goleba[] did not support the changes in her opinions with references to the medical record and her opinion is given little weight to the extent it conflicts with the [residual functional capacity assessment] as it is not consistent with her own treatment record and the medical evidence in general." (Tr. 18.) Griffith says that "had the ALJ cared to look at the medical records," he would have noticed two apparent reasons for Dr. Goleba's change in opinion. (Pl.'s Mot. Summ. J. at 19.) In particular, Griffith says that the three injections she received between December 18, 2009, and January 22, 2010, made her back worse. (Pl.'s Mot. Summ. J. at 19.) Griffith also says that the records show that her anemia worsened between Dr. Goleba's two opinions. (Pl.'s Mot. Summ. J. at 19 (citing Tr. 291, 502, 572).)

The Court agrees with the ALJ that Dr. Goleba did not explain why she provided significantly different limitations in February and August 2010, and disagrees with Griffith that the medical record provides the reasons. Starting with what Dr. Goleba said, she justified her August 2010 sitting, standing, and walking restrictions with "back spasms" and "stiffness" (Tr. 554) and,

32

arguably, morbid obesity (*see* Tr. 549). But Griffith's back problems were surely known to Dr. Goleba prior to February 2010 given that Griffith saw her following her February 2009 fall (Tr. 417), reviewed the May 2009 lumbar-spine MRI (Tr. 412, 451), saw Griffith following her September 2009 fall (Tr. 410), and was apprised of Dr. Reddy's treatment via letters from November 2009, December 2009, January 2010, and early-February 2010 (*see* Tr. 296, 298, 299-307 (letters from Reddy to Goleba)). And Griffith suffered from obesity throughout the disability period; indeed, Dr. Goleba provided morbid obesity as a basis for her February 2010 opinion. (Tr. 358.) So the ALJ was correct that Dr. Goleba did not support the differences in her two opinions.

Griffith is incorrect that the record reflects that her back pain worsened after the injections. To the contrary, Dr. Reddy's February 9, 2010 treatment note reflects a 50% improvement and a greater ability to walk. (Tr. 296, 298.) Griffith says Dr. Reddy's February 9 diagnosis shows that the "injections failed and had made her back worse" (Pl.'s Reply (citing Tr. 298)), but fails to recognize that Dr. Reddy gave the same diagnosis prior to the injections (Tr. 306). And even if Griffith was correct, Dr. Goleba would have been informed of the February 9 diagnosis prior to her February 25, 2010 opinion.

As for Griffith's claim that her anemia worsened between Dr. Goleba's two opinions, that claim lacks record support. By August 2010, Griffith had received two courses of iron, and, in April 2010, physician assistant Decker noted that Griffith's anemia was improving. (Tr. 364, 454.) Griffith cites Dr. Arora's July 2010 treatment note (Pl.'s Mot. Summ. J. at 19), but that note does not say or even imply that Griffith's anemia had worsened. (*See* Tr. 502.) In fact, Dr. Arora noted "[m]ild fatigue" and wanted to check Griffith's iron levels prior to ordering another round of supplementation. (*Id.*)

33

In short, the Court believes that the ALJ gave a "good reason" for discounting Dr. Goleba's August 2010 opinion: it was inconsistent with her opinion from just six months earlier and Dr. Goleba did not explain the inconsistencies or support her new limitations with her medical records. (*See* Tr. 18.) The Court therefore finds that the ALJ's decision to give Dr. Goleba's August 2010 opinion "little weight" was both reasonable and adequately explained.

### C. The ALJ's Consideration of Griffith's Obesity

Griffith, who is 5' 6" tall and weighed between 270 to 300 pounds during the disability period (*see* Tr. 298, 300), says that the ALJ used boilerplate language to address her obesity and "failed to consider [her] obesity under SSR 02-1p." (Pl.'s Mot. Summ. J. at 15.)

The Court disagrees. Social Security Ruling 02-1p, while giving guidance on how an ALJ should consider a claimant's obesity at each step of the disability analysis, "'does not mandate a particular mode of analysis.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)). Further, the ALJ did more than recite boilerplate language. He acknowledged that Griffith's obesity was a severe impairment and also explained,

> The claimant alleged that obesity is a severe impairment. The fact that obesity can cause limitation of function was considered. An individual may have limitations in any of the exertional functions such as standing, walking, lifting, etc. It also may affect ability to do postural functions such as climbing, stooping, kneeling or crawling. The ability to manipulate may be affected by the presence of fatty tissue in the hands and fingers. The functions likely to be limited depend upon many factors, including where the excess weight is carried. When evaluating the claimant's obesity as a severe impairment, the undersigned has given consideration to all the foregoing factors during the sequential evaluation at Step 3, Step 4 and Step 5, and has given consideration to Social Security Ruling 02-1p, which supersedes Social Security Ruling 00-3p.

34

(Tr. 12.)

Further, aside from perhaps Dr. Goleba's opinions, there is little evidence that Griffith's obesity significantly exacerbated her other impairments or, if it did, that the resulting limitations were greater than those in the ALJ's residual functional capacity. *See Smith v. Astrue*, 639 F. Supp. 2d 836, 846 (W.D. Mich. 2009) (declining to remand under S.S.R. 02-01p where plaintiff did not carry her "burden of marshaling competent medical opinion and evidence to show specifically how her obesity exacerbated her other impairments, or interacted with them, to render her incapable of all suitable work."); *cf. Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662 (6th Cir. 2004); *Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852 (6th Cir. 2003). Griffith, while asserting limitations based on knee and back pain, did not testify about her obesity at her hearing. (*See* Tr. 29-31.) Griffith is correct that Dr. Goleba's treatment notes reflect a diagnosis of obesity on multiple occasions and reflect that Dr. Goleba discussed weight loss with Griffith, including bariatric surgery. (*See* Tr. 402-21.) But those records do not indicate, with any clarity at least, that Griffith's obesity made her other impairments, for example, her lumbar-disc herniation, significantly worse. (*See* Tr. 402-21.) When Dr. Reddy evaluated Griffith's lumbar spine in November 2009, he noted morbid obesity and recommended that Griffith "[c]ontinue aquatic therapy as planned and weight loss program"; yet his assessment did not associate obesity with Griffith's back pain. (Tr. 306.) Instead, he diagnosed "[a]ssociated depression and anxiety." (Tr. 306.) As for Dr. Goleba's August 2010 opinion, it does provide that Griffith had "limited ambulation [and] [activities of daily living] due to morbid obesity." (*See* Tr. 549.) But this statement is vague and is not necessarily inconsistent with the ALJ's residual functional capacity assessment limiting Griffith to six hours of walking or standing during the day with only occasional stair climbing and occasional stooping, kneeling, and crouching. (Tr.

35

14.) In any event, as already explained, the ALJ reasonably gave Dr. Goleba's August 2010 opinion "little weight."

In all, Griffith has not shown that the manner that the ALJ considered her obesity resulted in reversible error.

### D. The ALJ's Consideration of Rumptz's Testimony

Griffith asserts that the ALJ's narrative makes "absolutely no mention of the fact that [her] mother, Belinda Ann Rump[tz], testified at the hearing." (Pl.'s Mot. Summ. J. at 16.) Griffith further contends that the ALJ did not even consider her testimony. (Pl.'s Mot. Summ. J. at 16; *see also* Pl.'s Reply at 2 ("The ALJ does not even mention that Plaintiff's mother testified in his decision, let alone consider the informative testimony she gave.").) Although the Court agrees with Griffith that the ALJ did not discuss Rumptz's testimony in his narrative, the Court disagrees that the ALJ reversibly erred.

As an initial matter, it does not directly follow from the fact that ALJ failed to discuss Rumptz's testimony in his written decision, that he "completely ignore[d]" Rumptz's statements and "brushed" them "under the carpet." (*See* Pl.'s Reply at 2.) Rumptz did not merely complete a function report that may have been overlooked in a lengthy administrative record. Instead, she testified at the hearing before the ALJ and the ALJ asked her several questions. (Tr. 52-53, 56-59.) The ALJ's failure to discuss Rumptz's statements, does not mean they were not considered. *See Kornecky*, 167 F. App'x at 508 ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))); *Patrick v. Astrue*, No. 07-161-JBC, 2008 WL 3914921, at *6 (E.D. Ky. Aug. 19, 2008) ("20 C.F.R. § 404.1513(d)(4)[]

36

merely states that the ALJ *may* use evidence from '[o]ther non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy)' to determine the severity of the impairment. . . . However, as stated by the Commissioner, the regulation does not indicate that the ALJ *must* state in his decision what credibility and weight he gave to Plaintiff's wife's statements.").

Further, the ALJ's narrative provides an implicit rationale for rejecting Rumptz's testimony. *See Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) ("The Council's lengthy discussion of the medical evidence makes it clear that it did not credit any testimony at variance with the objective record. That the Council did not explicitly say it would not accept hearing testimony at face value is not reversible error under the circumstances of this case."). In particular, the ALJ assigned "significant weight" to the opinion of Dr. Dickson, the consultative examiner who assessed Griffith's mental impairments, while discounting Griffith's testimony, social worker DeWolfe's opinion, and Dr. Thorburn's opinion. (Tr. 17.) In other words, the ALJ made clear enough that he was crediting Dr. Dickson's opinion over other assessments of Griffith's mental functional capacity. And Dr. Dickson's opinion is contrary to Rumptz's testimony. Dr. Dickson opined that Griffith had the ability to "understand, attend to, remember, and carry out instructions" and that her "abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace" were only "moderately" impaired. (Tr. 479.) He also thought Griffith "seem[ed] capable of unskilled work." (*Id.*) In contrast, Griffith's mother provided that "[w]ork stress" would cause Griffith to vomit; that if Griffith were to be around people, the associated stress and fear would induce vomiting; and that Griffith's concentration and focus were inadequate to independently perform tasks such as unloading a dishwasher. (Tr. 50-51.) Thus, by crediting Dr. Dickson's

37

opinion, the ALJ implicitly, but necessarily, discounted Rumptz's testimony and rejected her description of extreme limitations.

Of course, the ALJ's decision to assign "significant" weight to Dr. Dickson's opinion would not justify discrediting Rumptz's testimony if the ALJ unreasonably credited the consultative examiner's findings and the record supported Rumptz's testimony. *Cf. Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983) ("Perceptible weight must be given to lay testimony where . . . it is fully supported by the reports of the treating physicians."). But Griffith has not developed this argument. She does not argue, for example, that the ALJ erred in discounting the opinions of Dr. Thorburn or DeWolfe. (*See* Pl.'s Mot. Summ. J. at 18-19.) And she does not argue that Dr. Dickson's opinion is unsupported by the record. She does argue that, given Dr. Dickson's diagnosis of Asperger's, the ALJ inconsistently questioned the validity of her Asperger's diagnosis while assigning Dr. Dickson's opinion significant weight. (Pl.'s Mot. Summ. J. at 14.) But this was not necessarily inconsistent as the ALJ stated only that Griffith's "exam records" did not support a diagnosis of Asperger's. (Tr. 17.) Further, the ALJ did not say he was adopting Dr. Dickson's opinion part-and-parcel: the ALJ could have reasonably thought that Dr. Dickson could more accurately opine on her functional ability than diagnose her mental disorders. *Cf. Collins v. Astrue*, No. 1:09-CV-797, 2011 WL 1791876, at *5 (S.D. Ohio Mar. 8, 2011) ("A diagnosis, in and of itself, is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual."), *report and recommendation adopted by*, 2011 WL 1753621 (S.D. Ohio May 9, 2011).

Finally, Griffith's reliance on *Koslinski v. Comm'r of Soc. Sec.*, No. 1:11-1233, 2013 WL 1305326 (W.D. Mich. Mar. 28, 2013), is misplaced. In *Koslinski*, the Court held that the ALJ

38

reversibly erred because, while the administrative record was rich with treatment notes, including opinions by medical experts, the ALJ used vague "one or two sentence summaries" that made it "virtually impossible to understand the medical provider's involvement or to differentiate between treating physicians and non-treating physicians." *Id.* at *5. The court concluded that the ALJ's analysis did not allow "meaningful appellate review." *Id.* Then, in proceeding to address the claimant's argument that the ALJ ignored lay-witness evidence, the court provided that it could not "determine whether the ALJ committed error in failing to give weight to these witnesses, due to the ALJ's failure to adequately address plaintiff's medical history." *Id.* Here, the ALJ did discuss much of Griffith's treatment history and separately summarized each of the medical opinions of record. The reasoning of *Koslinski* is therefore inapposite on the facts of this case.

In all, Griffith has not shown that the ALJ reversibly erred in failing to discuss Rumptz's testimony.

### E. The ALJ's Assessment of Griffith's Credibility

Relatedly, Griffith claims that the ALJ erred in assessing her credibility. (Pl.'s Mot. Summ. J. at 17-18.) She says that it was error "for the ALJ to be dismissive" of her Asperger's Syndrome because she mentioned taking a college course. (Pl.'s Mot. Summ. J. at 17 (citing Tr. 17).) Griffith also asserts that the ALJ erred in discounting her testimony on the basis that her anemia had improved. (Pl.'s Mot. Summ. J. at 18.) Neither of these arguments demonstrate that the ALJ erred in assessing Griffith's credibility. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the

39

opportunity, which [a court does] not, of observing a witness's demeanor while testifying").

Regarding Griffith's anemia, the ALJ stated, "Although the claimant has been treated for anemia and related problems, these symptoms appear to have improved or resolved." (Tr. 15.) In asserting that this conclusion was error, Griffith relies on Dr. Goleba's August 2010 opinion (Tr. 549-50), a November 2010 treatment note (Tr. 572), and records allegedly dated just two months prior to the administrative hearing that reflect an infusion of iron (Tr. 562-74). (Pl.'s Mot. Summ. J. at 18.)

Substantial evidence supports the ALJ's finding that Griffith's anemia improved. As already discussed, the ALJ reasonably discounted Dr. Goleba's August 2010 opinion. And, in any event, Dr. Goleba did not opine that the cause of Griffith's functional limitations was her anemia—that was merely one of several impairments on which Dr. Goleba based her opinion. (Tr. 549, 553.) As for the November 2010 treatment note Griffith cites, it is true that she then reported fatigue, nausea, vomiting, mild dizziness, and aches and pains. (Tr. 572.) But Dr. Arora ordered another iron infusion, and in December 2010, Griffith complained of only anxiety and mild dizziness. (Tr. 568.) In February 2011, Griffith saw Dr. Bikkina, whose treatment note is somewhat ambiguous. (Tr. 616.) Griffith reported "being tired" and having "some dizziness" and heavy periods. (Tr. 616.) Yet, Dr. Bikkina's impression was "[t]he patient with *history* of iron deficiency anemia *in the past* and heavy periods." (*Id.* (emphasis added).) He also wanted to repeat Griffith's blood-work to see if she needed "any supplementation at this time." (Tr. 617.) The Court cannot say that the ALJ unreasonably emphasized the "history" aspect of Dr. Bikkina's statement. (Tr. 16.) Indeed, at the administrative hearing, Rumptz testified that Griffith's most recent infusion was in December 2010—five months prior to the May 2011 administrative hearing. (Tr. 52; *see* also Tr. 567 (infusion

40

on December 10, 2010).) Griffith's claim that the administrative record reflects an infusion just two months before the hearing is simply incorrect. (*See* Tr. 562-74.)

Turning to Griffith's testimony about the limitations she experiences from Asperger's Syndrome, Griffith does not address the fact that the ALJ discredited her testimony only to the extent that it was inconsistent with his residual functional capacity assessment. (*See* Tr. 15.) And for reasons already discussed at length, the majority of her testimony about her mental impairments is reasonably consistent with that assessment. The only aspect of Griffith's testimony that is not accounted for by the ALJ's residual functional capacity assessment is her allegations about agoraphobia. But, as discussed, the record does not corroborate those allegations and Griffith has not shown that remand is necessary for an ALJ to consider them.

In all, Griffith has not demonstrated that the ALJ reversibly erred in assessing her credibility.

**F. The ALJ's Hypothetical to the Vocational Expert and His Residual Functional Capacity Assessment**

Griffith's last claim of error is a cumulative one. She says that the ALJ's hypothetical to the vocational expert and, similarly, his residual functional capacity assessment, was flawed because it did not adequately account for her "anxiety, obesity, . . . Asperger's[,] very poor social skills which include asking people inappropriate things, blurting things out and unusual mannerisms." (Pl.'s Mot. Summ. J. at 20.) These arguments have been thoroughly addressed.

Griffith also claims that the ALJ's hypothetical to the vocational expert did not account for an unidentified "treating doctor's" findings that she was unable to complete a normal workday and workweek without interruptions or perform at a consistent pace without an unreasonable number of rest periods. (Pl.'s Mot. Summ. J. at 22.) The limitation that Griffith refers to comes from a form completed by social worker DeWolfe, not a "treating doctor[]." (*See* Tr. 557-58.) The ALJ gave

41

DeWolfe's opinion "limited weight." (Tr. 18.) Griffith has not explained how this was error. Accordingly, Griffith has not shown that the ALJ erred in declining to find that Griffith lacked the ability to complete a normal workday and workweek without interruptions or perform at a consistent pace without an unreasonable number of rest periods.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that Griffith has not shown that the ALJ reversibly erred in evaluating the limitations attributable to Asperger's Syndrome or her other impairments. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 13) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 15) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not

constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson                           
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  February 14, 2014


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 14, 2014.


s/Jane Johnson                               
Deputy Clerk